**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BOYCE SINGLETON,

    Petitioner,

v.

STEVEN JOHNSON, et al.,

    Respondents.

Civil Action No. 17-10729 (KMW)

**OPINION**

**WILLIAMS**, District Judge:

This matter comes before the Court on Petitioner Boyce Singleton's amended petition for a writ of habeas corpus. (ECF No. 22.) Following an order to answer, Respondent filed a response to the amended petition. (ECF No. 29.) Petitioner did not file a reply. (ECF Docket Sheet.) For the following reasons, Petitioner's amended habeas petition is denied.

**I.**    **BACKGROUND**

In the opinion affirming Petitioner's conviction and sentence, the New Jersey Supreme Court summarized the factual background of this matter as follows:

> In September 2005, [Petitioner] killed his pregnant girlfriend, Michelle Cazan. He was indicted and tried in June 2008 on a charge of first-degree murder and other related offenses, including tampering with evidence and hindering. [Petitioner] has never disputed that he killed Cazan. His defense at trial was keyed to whether he should be found not guilty by reason of insanity. Afflicted with schizoaffective disorder, [Petitioner] had developed the delusional religious belief that he was authorized to kill those who violated "God's word." [Petitioner]'s mental illness was the centerpiece of the parties' summations and the trial court included

the model charge on the insanity defense, which refers to the defendant's ability to comprehend that his action is wrong, in its instructions to the jury. [Petitioner] interposed no objection to the insanity charge's content [at trial].

Petitioner's insanity defense proved unsuccessful as the jury convicted him of murder, as well as the other charged offenses. . . .

. . . .

[Petitioner]'s expert in forensic psychology and the State's expert agree that [Petitioner] suffers from schizoaffective disorder.[] At trial [Petitioner] produced lay witnesses – five family members and one friend – and testified on his own behalf to provide insight into his mental illness prior to and during the events related to Cazan's death. That testimony showed that [Petitioner] had developed a set of delusional religious beliefs derived from his perspective on scripture. Importantly, he believes that he has an obligation to kill sinners, especially sinners who attempt to deter him from honoring God's word according to his strongly held, personal interpretation of the Bible's Old Testament.

[Petitioner]'s mental illness significantly manifested itself during his relatively brief period of attendance of college. In 2003, he turned to religious study for guidance, discipline, and a means of control over his life, but soon developed a preoccupation with the Bible and God and became obsessed with the Old Testament. His interpretation of scripture developed into a delusional system that, the experts agree, distorts his logical reasoning. For example, [Petitioner] came to believe that money was the root of all evil because people idolized it, rather than God. On one occasion, his distaste for money led him to choose imprisonment for failure to pay a court fine over violating his belief in the wrongness of using money. His mother obtained his release by paying the fine herself.

According to [Petitioner], over time, he became convinced that he was a "soldier" for God. He testified that he came to believe that God communicates with him, although he does not claim to hear a distinct voice speaking or commanding him. Rather, he receives messages or communications from God while asleep.[] As he explained in his testimony, and in a statement to police after Cazan's death, he felt a general obligation to kill sinners who did not comport themselves with his beliefs about God's expectations, once he explained those expectations to them. Indeed in 2005, not long before Cazan's murder, [Petitioner], who had moved back into his parents' home, told his older sister, Lakeisha, "if I didn't love you

2

so much, you would have already been dead, because the voices told me to kill all of you all because you're sinning."

On another occasion, during the spring of 2005, [Petitioner] threatened the gay friend of his younger sister Shakia, who was staying at their parents' home. [Petitioner] claimed that he "heard something say to me go downstairs and kill him because he was homosexual." Shakia's friend left the home without being physically harmed, but by July 2005, [Petitioner]'s beliefs and behaviors had become too extreme for his mother and siblings. Although [Petitioner] had not yet acted on his beliefs, he was asked to leave the home.[]

On July 27, 2005, he moved in with Michelle Cazan, a friend of Shakia and a participant in the same bible studies group as [Petitioner]'s mother and Shakia. The relationship became intimate within one week's time and, on September 12, 2005, Cazan told [Petitioner] that she was pregnant. [Petitioner] killed her the next day. . . .

On September 13, 2005, while Cazan was at work, [Petitioner] went with a friend to an Air Force and Army recruiting center to discuss enlistment, which he explained was motivated by a desire to help his "family," meaning his parents and siblings who were struggling, not Cazan. He claimed that he trusted in God to look after Cazan and the baby that was on the way. Still, he was conflicted about enlisting even to help his parents and siblings because he would be working for money, which would be contrary to his religious beliefs.

That afternoon, [Petitioner] picked up Cazan from work later than she expected, causing her to miss an appointment she had scheduled with an organization that might have provided a source of employment for [Petitioner]. He knew that she was not happy about missing the appointment, but testified that they did not argue about it. However, there was tension between the two and they had a discussion during which he considered leaving Cazan's vehicle, but did not. Instead, he agreed to accompany her on a visit to her hometown of East Rutherford to see places that were important to her, including her brother's gravesite.

During the trip north, the two quarreled over their future. Cazan was concerned about his ability to provide for the baby. As for [Petitioner], he had reached the conclusion that he would not enlist in military service because he was uncomfortable with the idea of serving "a God other than my God" by earning "evil" money. And, he became increasingly disturbed over Cazan's change of heart

3

from earlier discussions in which they had talked about going "into the woods" and living apart from a money-based civilization. He felt she had turned from the religious beliefs and principles he thought they shared. He grew more upset with Cazan during the conversation because he felt as though she had not fully adopted his religious beliefs and, worse, she was driving a wedge between him and God. He testified that he began to view Cazan "[a]s a prostitute," because "she was prostituting herself to another God." [Petitioner] said he "didn't trust her," and that he "didn't want to be around her . . . [or] with her anymore." Moreover, on arriving in East Rutherford, [Petitioner] did not respond favorably as Cazan showed him the area. He said he became "enraged" by her "stories of mob activity" that allegedly had occurred in the vicinity. He regarded her as "bragging" about it, which offended him.

At approximately 10:30 p.m., the two arrived home at Cazan's condominium in Mansfield. [Petitioner] claims that, at this point, he was very upset. After using the first-floor bathroom, he went upstairs to the bedroom where Cazan was and asked her to give him the keys to her BMW. She refused. He admitted at trial that had she given him the keys he would have left. However, when she would not give him the car keys, he pulled a revolver from his waistband and shot her four times, emptying the gun. One bullet went through her face and out behind her ear, another entered her chest and passed through her rib cage, chest cavity, and lungs, exiting through her lower back. Forensic evidence showed that Cazan was shot twice more in the back while on her hands and knees. One bullet traveled through her trachea and exited through her neck. Cazan began to choke on her own blood. [Petitioner] said he "didn't want her to suffer," so he stabbed her, four times, in the chest and abdomen, one of which pierced her lung. The stab wounds were between three and six inches in depth. She died within minutes.

[Petitioner] took the knife, but left behind the handgun, and drove Cazan's car to the home of his friend William Britt, where both William and his brother John were. There he washed his hands of blood and gunshot residue and changed his clothes. During the next few hours, [Petitioner] and his friends drank alcohol and smoked marijuana. Although [Petitioner] told William and John that he had killed Cazan, neither believed him.

Early the next morning, [Petitioner] left Cazan's car around the corner from Britt's home in Trenton and walked to Morrisville, Pennsylvania where his parents lived. Along the way, he threw the knife into a canal. He did so because he said he had learned from "movies" that "you're supposed to get rid of the murder weapon."

4

According to [Petitioner], at that time, he "planned on running" and "kill[ing] everybody . . . until [he] got killed." However, when he arrived in Morrisville at about 2:00 a.m., he met his older sister Lakeisha also arriving home and asked her to drive him to Cazan's house. According to Lakeisha, he told her that he had shot and stabbed Cazan, that she was dead, and that he had left the gun behind at the house. Lakeisha testified that during this trip, [Petitioner] had "many rambling conversations" in which he was not talking directly to her: "Whoever he was talking to or whatever he was hearing, he was responding to. But the conversation wasn't for me." At Cazan's home, he asked Lakeisha to let him out in the back of the home and to wait for him in the car.

According to [Petitioner], after determining that no police or others were in or around Cazan's home, he went inside, retrieved his gun, wiped down the door handles, and otherwise attempted to clean the blood splatter. He placed the gun and the cleaning materials he had used in a garbage bag and left, returning to Lakeisha's car. He asked her to take him to Britt's home. Along the way she convinced him to go instead to their parents' home in Morrisville. There he told his father what he had done and fled the area, intending to go to a family member's home in North Carolina, along the way retrieving his duffle bag from Britt's home. In his later statements he explained that the police were his enemy because, if he was captured, he could not serve God. However, when he reached Baltimore, he abandoned his plan and returned home after talking with his mother.

Arriving back at his parents' home, he told his family that he planned to turn himself in but wanted to "hold Cazan" before doing so. So, on September 15, he drove Cazan's BMW to her home. His brother, Damon, rode with him, and Lakeisha and his mother followed in a separate car. Damon testified that during the trip [Petitioner] "was talking to someone" other than him. [Petitioner] entered Cazan's home alone, repositioned her body and clothing, and placed a stuffed animal sprayed with perfume at her side. Concerned by the amount of time that had elapsed, Damon entered the condo and said that he found [Petitioner] holding Cazan's body, "trying to wake her [and] telling her [to] wake up." Meanwhile, [Petitioner]'s mother had arranged for the police to be contacted by one of Cazan's neighbors.

Mansfield Patrolman Jason Abadia responded and, after back-up arrived, he arrested [Petitioner]. Abadia testified that [Petitioner] stated, "I killed her. I killed her. Don't leave her like that. Cover her up. I killed her." Abadia read [Petitioner] his

5

> *Miranda* rights and [Petitioner] again stated he had killed Cazan, explaining also what he had done with the knife and gun.
>
> Detective Sergeant Lindsay Cooper of the New Jersey State Police took over the investigation approximately one hour later. To obtain a recorded statement from [Petitioner], Cooper reread the *Miranda* rights to [Petitioner]. During the interrogation, [Petitioner] admitted killing Cazan and claimed that he could see a vision of her smiling through the window of the squad car when he was first placed under arrest, and later from the vantage of the room in which he was interrogated. In explaining his killing of Cazan he stated that he was angry because of "that damn book," which he clarified as referring to the Bible. [Petitioner] told officers, "I lost it and the devil kept f…ing with me, he just kept f…ing with me and I lost it . . . ." When asked if anyone else was involved in Cazan's killing, [Petitioner] answered, "No, the devil, god and the devil (inaudible) inside of me, outside of me, all over the place, all over the place."

(ECF No. 25-9 at 1-6.)

## II. LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

6

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta[,]" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III. DISCUSSION

#### A. Petitioner's jury instruction claims

In his first two claims, Petitioner contends that his Due Process rights were impugned by the trial court's failure to alter its insanity instruction to include a Deific Command instruction and in failing to *sua sponte* charge the jury as to diminished capacity. That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001). A habeas petitioner will not be entitled to relief based on an allegation of improper jury instructions at trial unless "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154

7

(1977). The Supreme Court has held that the "category of infractions that violate fundamental fairness" is very narrow, *Estelle*, 502 U.S. at 72-73, and challenged jury instructions must be considered in the context of the entire charge and the trial as a whole, with habeas relief available only in cases in which the charge was so erroneous that it resulted in a violation of Due Process in light of all the relevant facts. *Duncan*, 256 F.3d at 203. Even where an instruction is "undesirable, erroneous, or even universally condemned," habeas relief will not be warranted unless the charge rendered the trial fundamentally unfair. *Id.*

Turning first to the diminished capacity issue, Petitioner contends that the trial judge should have provided a jury charge on diminished capacity as the expert testimony provided at trial clearly suggested that Petitioner's mental illness affected his appreciation of the nature of his acts. During the remand to the Appellate Division from the New Jersey Supreme Court on direct appeal, the Appellate Division rejected this claim as being without merit as "the trial judge actually did instruct the jury on diminished capacity principles, and properly so." (ECF No. 25-10 at 2.) As the Appellate Division held that Petitioner actually did receive a diminished capacity charge, and the record of the jury charge supports that conclusion, Petitioner's contention that his rights were violated by a failure to give such a charge is utterly without merit and provides no basis for habeas relief.

In his remaining jury charge claim, Petitioner contends that the trial court improperly failed to tailor its insanity charge to include a "Deific Command" charge. This claim was rejected by the New Jersey Supreme Court on direct appeal. In rejecting this claim, the New Jersey Supreme Court noted that New Jersey uses the M'Naghten test insanity defenses which requires that a defendant show that he was "laboring under such a defect of reason . . . as not to know the nature and quality of the act he was doing" and that, as a result, "he did not know what he was doing was wrong." (ECF No. 25-9 at 10.) Under New Jersey law, "wrong" in this context "embraces more

8

than just the concept of legal wrong, and instead requires a defendant to appreciate society's moral judgment. (*Id.* at 11.) That said, in "the vast majority of cases, if the defendant was capable of understanding that he was acting contrary to law, he would also have sufficient capacity to understand that he was acting contrary to the morals of society," and thus legal and moral wrong are generally considered "coextensive" for the purposes of an insanity defense in state court. (*Id.*) The only generally recognized exception to this under New Jersey law is for so called "Deific Command" cases where the defendant believes that he committed his illegal acts "in obedience to a command from God." (*Id.*) In such cases, New Jersey law would normally require a specially tailored insanity charge which required the jury to determine not only whether the defendant understood his actions were legally wrong, but also whether he understood they were morally wrong in light of his delusional beliefs. (*Id.*)

In Petitioner's case, the New Jersey Supreme Court found that the Deific Command exception did not apply as the evidence in Petitioner's case did not indicate that he actually believed he had received a divine command to kill his paramour, but instead merely based this belief on a personal interpretation of Old Testament scripture. (*Id.* at 13-15.) The New Jersey Supreme Court thus found that a more narrowly tailored insanity charge than the model charge given in Petitioner's case was unnecessary, and that the jury instruction in Petitioner's case was proper under state law. (*Id.*)

That determination was neither contrary to nor an unreasonable application of federal law. The Supreme Court has never held that the application of the M'Naghten test for insanity violated a criminal defendant's Due Process rights, nor that even using only one of the two prongs of that test – the inability to understand the nature or quality of the act or the inability to properly perceive legal or moral wrong – amounted to the "minimum that a [state] government must provide" to criminal Defendants. *Kahler v. Kansas*, 589 U.S. 271, 282 (2020). The nature and application of

9

an insanity defense in state criminal proceedings is thus "substantially open to state choice" and "no particular insanity test serves as a baseline for due process." *Id.* (internal quotations omitted). As "due process imposes no single canonical formulation of legal insanity," and the Supreme Court has repeatedly recognized the legitimacy of the M'Naghten test as one option a state may adopt to address insanity defenses, Petitioner cannot show that New Jersey's use of that rule or its formulation of that rule as applied in this case is contrary to or an unreasonable application of established federal law. *Id.* Thus, because the New Jersey Supreme Court held that Petitioner's insanity charge was lawful under state law, and as the Supreme Court has found similar formulations of an insanity defense more than sufficient to comply with Due Process, Petitioner in this matter cannot show that the insanity charge in his case was so improper or insufficient that it denied him Due Process. Thus, Petitioner's insanity charge related claim fails to serve as a basis for habeas relief.

### B. Petitioner's prosecutorial misconduct claim

Petitioner also contends that he was denied Due Process by several comments made by the prosecutor during trial. The Appellate Division rejected this claim on direct appeal, explaining as follows:

> [Petitioner] asserts three instances of prosecutorial misconduct. By the time of the first such instance, the jury had learned that [Petitioner] believed [the victim] was pregnant at the time of her murder. The judge had properly held that evidence that [Petitioner] believed this fact was admissible for the limited purpose of demonstrating a possible motive for the murder.[] In cross-examining [Petitioner]'s expert, . . . the prosecutor explored her statement that [the] pregnancy was a stressor that "ratcheted up the pressure" on [Petitioner]. The prosecutor asked whether the expert thought "things ratcheted up to the point where it provided [Petitioner] with a motive to kill [the victim]," and the expert replied that she thought not because [Petitioner] had "talked about wanting to take care of his child." In response – more rhetoric than question

10

– the prosecutor said: "He did that . . . that night, didn't he?" When [the expert] responded with "Pardon me?", the prosecutor repeated: "He did that that night, didn't he?"

> Defense counsel immediately objected and, at sidebar, moved for a mistrial. There, the trial judge characterized the prosecutor's question or comment as "outrageous," and the prosecutor conceded it "came out stronger" than intended. The judge, however, denied the application for a mistrial, choosing instead to forcefully instruct the jury [to disregard the improper comment and not consider it for any purpose].

. . . .

> [Petitioner also challenges] two other statements by the prosecutor that he believes represent prosecutorial misconduct warranting a new trial. He argues that the prosecutor engaged in misconduct during his summation by impugning [Petitioner's expert's] integrity because she had not included in her report certain statements made by [Petitioner, and] he amplified that theme by reference to the O.J. Simpson murder trial, with the following comment in his summation: "In the OJ trial, it was, if the glove doesn't fit, you must acquit. Well, in [the expert's opinion], it if doesn't fit my defense you must ignore. It's not as catchy, but it applies here." Viewed separately or collectively, [Petitioner] contends that the prosecutor's statements both during the cross-examination of [Petitioner's expert] and in discussing her opinions during summation were so egregious as to warrant a new trial.

. . . .

> Although the prosecutor's comment during cross-examination . . . was out of bounds, we reject [Petitioner]'s contention that only a mistrial could adequately address this departure from proper advocacy. . . .

> To be sure, the prosecutor's rhetorical question fell outside the bounds of proper advocacy. The remedy for such a circumstance, however, rested in the trial judge's discretion. The judge determined, based on her feel of the case, that a mistrial was not warranted; she instead gave a strongly worded direction to the jurors that the comment should be ignored by them because it was improper and the prosecutor "knew it" was improper. We are satisfied, after closely examining the record, that the trial judge's choice of a remedy for this regrettable event was appropriate. . . .

11

> We also conclude that [Petitioner] was not unduly prejudiced by the prosecutor's statements during his summation regarding the scope of [the expert's] examination of the facts and her opinions. . .
>
> The comments made by the prosecutor cited by [Petitioner] in support [of this point] were largely focused on what the prosecutor was entitled to argue: that the defense expert had not given sufficient – or any – weight to evidence that, in the prosecutor's view, did not support the insanity defense. To that extent, we find the prosecutor's utterance of those comments did not unduly prejudice [Petitioner] but instead represented fair comment on the evidence. Indeed, defense counsel did not object or seek a disapproving instruction.
>
> We do agree that the prosecutor's reference to the Simpson murder trial was unnecessary and improper. Defense counsel, however, did not object to those comments. . . . We cannot [find that this was capable of producing an unjust result].

(ECF No. 25-10 at 2-3.)

The duty of a prosecutor in a criminal proceeding is to see that justice is done rather than to secure convictions, and prosecutors must therefore "refrain from [the use of] improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016). While a prosecutor "may strike hard blows [during his summation], he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88; *Bailey*, 840 F.3d at 124. A criminal conviction, however, "is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985). Prosecutorial misconduct will therefore only warrant habeas relief where it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Copenhefer v. Horn*, 696 F.3d 377, 392 n. 5 (3d Cir. 2012).

In this matter, the Appellate Division's finding that Petitioner had not been deprived of a fair trial by the prosecutor's remarks is neither contrary to nor an unreasonable application of federal law. As the Appellate Division noted, although the prosecutor's comments during cross-examination were improper, the trial court gave the jury a strong charge directing them to ignore the clearly improper comment, undercutting any potential the comment may have had to render Petitioner's trial unfair. Likewise, the comments as to the defense expert ignoring inconvenient facts in her analysis of Petitioner were clearly fair comment on the record and thus were not improper. Finally, while the OJ trial comment was utterly unnecessary and was at least arguably improper, it was a fleeting comment which was not the focus of the prosecutor' summation which was clearly not capable of rendering Petitioner's trial fundamentally unfair. Having considered the alleged misconduct in light of the record of the entire trial and the trial judge's curative instruction, it is clear that the prosecutor's comments did not have the capacity to render Petitioner's trial so unfair as to impugn Due Process, and thus serve as no basis for habeas relief.

## C. Petitioner's evidentiary claims

Petitioner next argues that the trial court erred in admitting certain crime scene photographs of the deceased victim into evidence as Petitioner believes those photographs were unduly prejudicial. The Appellate Division rejected this claim as utterly meritless as the manner of the victim's death and Petitioner's actions during and shortly after her death were directly relevant to the jury's ability to determine Petitioner's mental state and the purposefulness of Petitioner's actions. (*See* ECF No. 25-10 at 4.)

Because "[t]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983), claims challenging the admissibility of evidence are normally considered

13

questions of state law which are not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); see *also Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009). A habeas petitioner may therefore raise a habeas claim based on a state law evidentiary ruling only where he can show that the admission of the evidence at issue denied him Due Process under the Fourteenth Amendment by depriving him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). "The Supreme Court has 'defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been fair; it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). Thus, a Due Process violation will only occur in the context of a state court evidentiary ruling when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

The admission of the crime scene photographs in question in this matter did not deny Petitioner a fundamentally fair trial. Although the gruesome nature of the photographs may have been prejudicial to Petitioner, Petitioner himself placed his mental state into issue, and thus the severity of the attack and Petitioner's use of the knife to expedite the victim's demise were directly relevant to the question of whether Petitioner understood the nature of his deeds and that those deeds were wrong in light of the law and society's moral standards. In light of Petitioner's placing

14

that issue into contention, and the nature of the charges against Petitioner, it is clear that the admission of the photographs was not so arbitrary as to render Petitioner's trial fundamentally unfair, and that the admission of this evidence thus did not deny Petitioner Due Process. The admission of the photos thus serves as no valid basis for habeas relief.

### D. Ineffective Assistance of Counsel

In his remaining claims, Petitioner asserts that he suffered from ineffective assistance of counsel. The standard applicable to claims of ineffective assistance of counsel is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's

15

> defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Petitioner first argues counsel was ineffective in failing to call as a witness a childhood friend who could have testified that she was not aware of him having a violent history with women despite knowing some of his prior girlfriends. The Appellate Division rejected this claim, finding that Petitioner could not show prejudice by this alleged failing as the overwhelming evidence produced at trial showed Petitioner's growing aggression and tendency towards violence, clearly established that he had violently killed the victim in this matter, and had previously threatened family and family friends, and that the testimony of Petitioner's childhood friend was thus of no real value to Petitioner. (*See* ECF No. 29-24 at 2.) This conclusion was neither contrary nor an unreasonable application of *Strickland* and its progeny. As noted by the Appellate Division, the childhood friend's testimony at best would have been undercut by the testimony of his family regarding Petitioner's growing aggression and threats, and was in any event of very little value generally in a case in which it was undisputed that Petitioner had repeatedly shot and stabbed the

16

victim. Petitioner was clearly not prejudiced by the failure to call his friend, and his habeas claim on that basis provides no basis for relief.

Petitioner next contends that counsel failed to fully cross-examine the state's psychiatric expert on his alleged failure to properly apply certain diagnostic tests in reaching his conclusions. The state courts rejected this claim, finding that the alleged mistake of the state's expert was of little value and the failure to raise it did not prejudice Petitioner as the two experts reached very similar conclusions regarding Petitioner's mental state, and the sole differing conclusion the two had about Petitioner – his ability to understand his actions were wrong – was not a determination made through the allegedly faulty testing. That conclusion was neither contrary to nor an unreasonable application of *Strickland*. Given the large agreement between the two experts as to Petitioner's mental state, and the irrelevance of the allegedly faulty testing to the state's expert's conclusion that Petitioner knew his actions were wrong, counsel's failure to cross-examine the expert on that basis was not likely to have affected the jury's verdict. Petitioner has thus not shown that he was prejudiced, and has thus failed to show his entitlement to habeas relief on this basis.

Petitioner next contends that counsel proved ineffective in failing to object to the presence of the state's expert witness at trial during the testimony of his own expert despite a sequestration order. Petitioner also contends that counsel failed to object to the state's expert's evaluation of Plaintiff on the basis that a tape recording of the expert's interview of Petitioner failed to capture portions of the evaluation, which Petitioner believes may have been intentional. The Appellate Division rejected these claims as meritless without further comment. This conclusion was neither contrary to nor an unreasonable application of *Strickland*. As noted by the PCR trial court in Petitioner's second PCR proceedings, applicable state law clearly holds that the state's expert is permitted to be present during the testimony of defense experts to whom he is responding. *See, e.g., State v. Popovich*, 405 N.J. Super. 324, 327-28 (App. Div. 2009). Any objection as to the

sequestration of the state's expert would therefore have been doomed to failure. Likewise, Petitioner has failed to show any valid basis for counsel to have objected to the state's expert's evaluation of Petitioner, as his claim to that effect is entirely based on bald assertions and speculations as to what may have occurred during the time when the interview was not tape recorded, and Petitioner has not otherwise shown a basis on which to object to the expert's testimony. In the absence of any showing that a motion challenging the expert's testimony would have had any real likelihood of success, Petitioner cannot show he was prejudiced by counsel's failure in this regard, and he cannot therefore show an entitlement to habeas relief. As all of Petitioner's claims are thus clearly meritless, his habeas petition must be denied.

### IV.     CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## V. CONCLUSION

In conclusion, Petitioner's amended habeas petition (ECF No. 22) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An order consistent with this opinion shall be entered.

                                                           Hon. Karen M. Williams,
                                                           United States District Judge